IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NVIDIA CORPORATION, | § | |
| | § | |
| Defendant Below, | § | No. 259, 2021 |
| Appellant, | § | |
| | § | |
| | § | Court Below – Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| CITY OF WESTLAND POLICE AND | § | C.A. No. 2020-0075 |
| FIRE RETIREMENT SYSTEM, | § | |
| DENNIS HORANIC, ELLEN HOKE, | § | |
| KALLESTAD TRUST, and STEPHEN | § | |
| P. FARKAS, | § | |
| | § | |
| | § | |
| Plaintiffs Below, | § | |
| Appellees. | § | |

Submitted: April 20, 2022
Decided: July 19, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

Gregory P. Williams, Esquire, Brock E. Czeschin, Esquire, Christian C.F. Roberts, Esquire, RICHARDS, LAYTON, & FINGER, P.A., Wilmington, Delaware; John C. Dwyer, Esquire (argued), Patrick E. Gibbs, Esquire, Claire A. McCormack, Esquire, COOLEY LLP, Palo Alto, California; *for Appellant NVIDIA Corporation*.

Seth D. Rigrodsky, Esquire (argued), Gina M. Serra, Esquire, Herbert W. Mondros, Esquire, RIGRODSKY LAW, P.A., Wilmington, Delaware; Frank R. Schirripa, Esquire, Hillary Nappi, Esquire, HACH ROSE SCHIRRIPA & CHEVERIE LLP, New York, New York; Gregory Mark Nespole, Esquire, Daniel Tepper, Esquire, LEVI & KORSINSKY, LLP, New York, New York; Travis E. Downs III, Esquire, Erik W. Luedeke, Esquire, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Thomas J. McKenna, Esquire, Gregory M. Egleston, GAINEY

MCKENNA & EGLESTON, New York, New York; Beth A. Keller, MONTEVERDE & ASSOCIATES PC, New York, New York; *for Appellees City of Westland Police and Fire Retirement System, Dennis Horanic, Ellen Hoke, Kallestad Trust, and Stephen P. Farkas*.

**MONTGOMERY-REEVES**, Justice, for the Majority:

This appeal arises from a final judgment of the Court of Chancery that ordered NVIDIA Corporation ("NVIDIA" or the "Company") to produce books and records to certain NVIDIA stockholders under Section 220 of the Delaware General Corporation Law. In the underlying action, the stockholders alleged that certain NVIDIA executives knowingly made false or misleading statements during Company earnings calls that artificially inflated NVIDIA's stock price, and then those same executives sold their stock at inflated prices. As such, the stockholders sought to inspect books and records to investigate possible wrongdoing and mismanagement at the Company, to assess the ability of the board to consider a demand for action, to determine whether the Company's board members are fit to serve on the board, and to take the appropriate action in response to the investigation.

NVIDIA argued that the stockholders were not entitled to the relief they sought because (1) the scope of the original demands failed to satisfy the form and manner requirements; (2) the documents sought at the trial were not requested in the original demands; (3) the stockholders failed to show a proper purpose; (4) the stockholders failed to show a credible basis to infer wrongdoing; and (5) the requests were overbroad and not tailored to the stockholders' stated purpose.

The Court of Chancery rejected these arguments and ordered the production of two sets of documents—certain communications with the CEO and certain

3

specific sets of emails. NVIDIA has appealed and challenges each of the Court of Chancery's rulings.

Having reviewed the parties' briefs and the record on appeal, and after oral argument, the Court holds that: (1) the stockholders' original demands did not violate Section 220's form and manner requirements; (2) the stockholders did not expand their requests throughout litigation; (3) the Court of Chancery did not err in holding that sufficiently reliable hearsay evidence may be used to show proper purpose in a Section 220 litigation, but did err in allowing the stockholders in this case to rely on hearsay evidence because the stockholders' actions deprived NVIDIA of the opportunity to test the stockholders' stated purpose; (4) the Court of Chancery did not err in holding that the stockholders proved a credible basis to infer wrongdoing; and (5) the documents ordered to be produced by the Court of Chancery are essential and sufficient to the stockholders' stated purpose. Thus, the judgment of the Court of Chancery is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

## I. RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A. General Background

NVIDIA is a California-based technology company that designs, manufactures, and markets, among other things, graphics processing units

("GPUs").[1] GPUs are computer chips that perform rapid mathematical calculations.[2] Traditionally, NVIDIA sold its GPUs for video gaming; these GPUs are marketed under the name "GeForce" ("Gaming GPU").[3] NVIDIA's gaming segment generates the vast majority of its revenue.[4]

In early 2017, NVIDIA experienced an increase in Gaming GPU sales as consumers began purchasing the product for use in cryptocurrency mining.[5] In response, NVIDIA created a new GPU specifically for mining that does not contain graphics capabilities ("Crypto GPU").[6] NVIDIA's goal in producing the Crypto GPU was to protect the Gaming GPU supply for gaming customers.[7] This strategy, however, did not appear to work; crypto miners continued to purchase Gaming GPUs for mining purposes.[8]

The increase in demand for Gaming GPUs created a unique problem for NVIDIA. NVIDIA does not sell Gaming GPUs directly to end users, but rather through a multi-level distribution channel.[9] The channel encompasses the time from

---

[1] App. to the Opening Br. 35 (hereinafter "A__"); Opening Br. Ex. A, at 4 (hereinafter, "Ex. A at __").
[2] A35.
[3] Opening Br. 7.
[4] A35.
[5] *Id.*
[6] *Id.*
[7] Opening Br. 8; A389.
[8] A36.
[9] Opening Br. 7.

when NVIDIA sells the GPU to when an end user purchases it.[10]  The channel will, at any given time, have some GPUs in inventory.[11]  And while NVIDIA suggests a retail price for its GPUs, it does not control channel or retail prices.[12]  "If sales at the end of the channel accelerate suddenly, before NVIDIA can increase the supply coming into it, supply for end users can get tight and prices can increase beyond what some are willing to pay."[13]  Thus, during the increase in purchases of Gaming GPUs by crypto miners, Gaming GPUs were scarce and prices increased.[14]  This had the effect of pricing gamers out of the market.[15]

### B.  The Earnings Calls and Stock Sales

From mid-2017 to late-2018, NVIDIA executives made a series of statements in various earnings calls about the effect of crypto mining on the channel and NVIDIA's revenue and about NVIDIA's ability to manage the increasing demand for Gaming GPUs.  These statements, detailed below, are the basis for various lawsuits against NVIDIA, including this action.

On an August 10, 2017 earnings call, NVIDIA executives discussed an increase in GPU sales driven by a spike in cryptocurrency prices.[16]  During the call,

---

[10] *Id.*
[11] *Id.*
[12] *Id.*; A403.
[13] Opening Br. 7.
[14] A530.
[15] *Id.*
[16] Ex. A at 6.

Jensen Huang, NVIDIA's CEO, stated, "There's still small miners that buy Gaming GPUs here and there, and that probably also increased the demand of Gaming GPUs. . . . [T]here's still cryptocurrency mining demand that we know is out there."[17] Collette Kress, NVIDIA's CFO, agreed that GPU sales "were lifted by demand from increasing mining activity" and noted that NVIDIA's "strategy is to stay alert to this fast-changing market . . . ."[18]

On November 9, 2017, during an earnings call, Kress suggested that NVIDIA "remains nimble in [its] approach to the cryptocurrency market."[19]

During a February 8, 2018 earnings call, Kress stated that miners were buying both Crypto GPUs and Gaming GPUs.[20] On this call, Huang stated that gamers' difficulty in purchasing Gaming GPUs due to the spike in crypto mining was leading to "fairly sizeable pent-up demand . . . ."[21]

During earnings calls on May 10, 2018, and August 16, 2018, Huang and Kress expressed optimism that "the gaming demand is strong" because there was still pent-up demand for Gaming GPUs from gamers.[22] During the August call, Huang stated that "channel inventory would work itself out" and "we're not

---

[17] *Id.*
[18] *Id.*
[19] App. to the Answering Br. 59 (hereinafter "B__").
[20] A398.
[21] *Id.*
[22] A530, 539; Ex. A at 7.

concerned about channel inventory."[23]  Huang also stated that "'the larger of a GPU company you are, the greater ability you could [sic] absorb the volatility [and] because we have such large volumes, we have the ability to rock and roll with this market as it goes.'"[24]

Between August 11, 2017, and September 28, 2018, NVIDIA's stock price rose from $155.96 to $281.02 per share.[25]  On September 6, 2017, Huang sold 110,000 shares of NVIDIA for $18.2 million.[26]  And, pursuant to a 10b-5 plan, Kress sold 36,333 shares for $7.7 million between October 2017 and September 2018.[27]

On November 15, 2018, NVIDIA announced that the pent-up gaming demand it predicted had not materialized, leading to excess inventory in the channel and a revenue miss.[28]  Huang stated that "excess channel inventory . . . declined slower than we expected and – but while it was declining, we were expecting sales volume to grow, demand to grow and for pricing to be – for volume to be elastic with pricing."[29]  NVIDIA's stock price declined 28.5 percent in the days following the call.[30]  On November 19, 2018, NVIDIA closed at $144.70 per share.[31]

---

[23] Ex. A at 7-8.
[24] A43.
[25] A42.
[26] A49.
[27] *See id.*
[28] A568.
[29] *Id.*
[30] A37.
[31] A48.

8

On January 28, 2019, NVIDIA lowered its earnings estimate for the fourth quarter of 2019, explaining that "[t]he Q4 guidance [] in November reflected the effect of excess channel inventory of Pascal mid-range GPUs that resulted from the sharp decline of cryptocurrency demand. We delayed the planned production ramp of several new products to allow excess channel inventory to deplete, which resulted in the significantly lowered Q4 guidance."[32]

On February 14, 2019, NVIDIA announced that Gaming GPU revenue for the fourth quarter was down forty-five percent year-over-year and forty-six percent quarter-over-quarter.[33]

By November 2019, NVIDIA's stock price returned to over $200 per share.[34]

## C.    Federal Securities Class Action

On June 21, 2019, certain NVIDIA stockholders filed a consolidated class action complaint (the "Securities Complaint") in the United States District Court for the Northern District of California (the "Securities Class Action").[35] The Securities Class Action, which named NVIDIA and several of its directors as defendants, including Huang and Kress, alleged that the defendants violated federal securities laws by making false or misleading statements about the effect of crypto mining on

---

[32] B102.
[33] Ex. A at 9.
[34] *Id.*
[35] B110.

NVIDIA's revenue and the demand for Gaming GPUs.[36] The Securities Complaint supported its allegations with public filings, NVIDIA transcripts and presentations, testimony from relevant experts, and information from former NVIDIA employees, among other things.[37]

On March 16, 2020, the United States District Court for the Northern District of California dismissed in part the Securities Class Action, holding that the plaintiffs failed to meet the standard of proof for falsity and raise a strong inference of scienter with respect to any of the individual defendants.[38] The court dismissed the motion with leave to amend.[39] The plaintiffs then filed an amended securities complaint (the "Amended Securities Complaint").

The Amended Securities Complaint added anonymous testimony from a former NVIDIA employee, named FE 1, alleging that Huang and other executives had specific knowledge of the impact of cryptocurrency on the channel.[40] Relevant to this appeal, the Amended Securities Complaint alleged that during a March 2017 meeting, FE 1 warned Senior Vice President and Head of Gaming, Jeff Fisher, and other executives that NVIDIA had to "take care" given the growing reliance on

---

[36] B110-74
[37] Ex. A at 10.
[38] B229-54.
[39] *Id.*
[40] A692-778.

crypto miners in China, which Fisher called "dangerous" during the meeting.[41] The Amended Securities Complaint also alleged a close relationship between Fisher and Huang, noting that "Fisher reported directly to Huang," that Fisher was one of NVIDIA's oldest employees, and that Fisher met with Huang weekly.[42] It also alleged that weekly sales reports quantifying the impact of crypto-mining demand on Gaming GPU sales was sent to Fisher and other executives throughout 2017.[43] NVIDIA filed a motion to dismiss the Amended Securities Complaint, which the court granted.[44]

### D.    Procedural History

Between February 22, 2019, and April 16, 2019, City of Westland Police and Fire Retirement System, Dennis Horanic, Ellen Hoke, Kallestad Trust, and Stephen P. Farkas, all NVIDIA stockholders, (collectively, the "Stockholders"), separately served Section 220 demands to NVIDIA (the "Original Demands").[45] Although these demands contained a variety of requests, City of Westland's first demand was for "[a]ll documents forming the basis, if any, for NVIDIA's public statements about its ability to manage the inventory, supply chain and sales channel concerns around the cryptocurrency boom experienced by NVIDIA during the time period from 2017

---

[41] A767.
[42] A706.
[43] A724-26.
[44] A904-25.
[45] A50.

to 2019."[46] The Stockholders eventually served NVIDIA with consolidated requests (the "Consolidated Demands"), which sought, among other things, "[a]ll documents and/or communications used by NVIDIA's CEO, CFO and/or other executives with direct reporting responsibilities to the Board concerning the demand for the Company's GPUs, GPU inventory levels, sales channel conditions and other key business metrics monitored by the NVIDIA Board during the time period from 2017 to 2019."[47]

NVIDIA produced 78 documents that totaled about 530,000 pages.[48] In response, the Stockholders requested "the documents that formed the basis of Huang's and Kress's public statements about the Company's ability to manage its GPU sales considering the increased cryptocurrency demand . . . ."[49] NVIDIA responded that it had not agreed to that request and that such a request was too broad and could not be answered.[50]

On February 10, 2020, the Stockholders filed an action in the Court of Chancery seeking inspection of various NVIDIA books and records.[51] In their complaint, the Stockholders alleged that NVIDIA executives and Board members,

---

[46] A663.
[47] A676.
[48] Ex. A at 12.
[49] A686.
[50] A690.
[51] A33-65.

including Huang and Kress, "knowingly made, or allowed to be made, false and misleading public statements concerning the Company's internal controls, prospects, and earnings, while contemporaneously selling $147 million of Company stock at artificially inflated prices."[52] In particular, the Stockholders alleged that the following twelve public statements made by either Huang or Kress during earnings calls were false or misleading (collectively, the "Public Statements"):

- "[W]hen you think about crypto in the context of our company overall, the thing to remember is that we're the largest GPU computing company in the world. And our overall GPU business is really sizable and we have multiple segments."
- "[C]rypto usage of GPUs will be small but not 0 for some time."
- "[T]here's a fairly sizable pent-up demand going into this quarter" among gamers looking to purchase NVIDIA GPUs.
- The GPU supply "channel is relatively lean," and NVIDIA was "working really hard to get GPUs down to the marketplace for the gamers."
- "[W]e try to as transparently reveal our numbers as we can. And . . . our strategy is to create a[n] SKU that allows the crypto miners to fulfill their needs . . . as much as possible, fulfill their demand that way."
- "[We are] 'not concerned about the channel inventory . . . .'"
- "We are masters at managing our channel, and we understand the channel very well."
- "GPU sales [] benefited from continued cryptocurrency mining" . . . the Company "remains nimble in our approach to the cryptocurrency market" . . . "[the

---

[52] A35.

13

crypto-currency boom]" will not distract us from focusing on our core gaming market."

- "[C]hannels had been influenced by not only the strength of the overall gaming that we had seen for the overall holiday season, but also the large uptick that we've seen in the overall valuation of cryptocurrency." . . . "[We are] mak[ing] sure [] gamers worldwide receive the cards that we want to do."
- "[W]e do believe we can serve [cryptocurrency miners] primarily with those specialized cards and that's going to be our goal going forward" . . . "we're going to really try our hardest to really focus our overall GPUs for gaming for overall gamers going forward."
- "[NVIDIA] met some of this [cryptocurrency] demand with a dedicated board in our OEM business, and some was not met with our gaming GPUs. . . ." "[T]his contributed to lower than historical channel inventory levels of our gaming GPUs throughout the quarter."
- "[O]verall contribution of cryptocurrency to our business . . . was a higher percentage of revenue than the prior quarter . . . ." "[O]ur main focus remains on our core gaming market."[53]

The Stockholders also alleged that the NVIDIA insiders materially benefited by selling their stock when stock prices were artificially high.[54]

Before trial, the Stockholders told NVIDIA that they had not yet determined which witnesses they were going to call to testify regarding the purpose of the demand.[55] NVIDIA similarly did not identify witnesses, instead reserving the right to depose and cross-examine any witnesses identified by the Stockholders.[56] The

---

[53] A44-46.
[54] A48-50.
[55] A219.
[56] *See id.*; A788.

14

Stockholders then told NVIDIA "very late in the process" that they were considering using an affidavit instead of live witness testimony; NVIDIA responded that it would need to see the affidavit and then depose any individual testifying by affidavit.[57] The Stockholders eventually chose not to call any witnesses to testify to their purpose, instead relying on the purpose expressed in the Original Demands and interrogatories.[58]

On February 10, 2021, the Court of Chancery issued a transcript ruling.[59] The court started its analysis by determining whether the Stockholders had established a proper purpose.[60] The court found that the Company's demand stated the following purpose:

> investigating potential wrongdoing and mismanagement at the Company related to NVIDIA's GPU sales and insider stock sales; assessing the ability of the board to consider a demand for action; determining whether the current directors are fit to continue serving on the Board; and taking appropriate action in response, including discussing potential reforms with the board and management or filing a derivative action.[61]

---

[57] A219-20, 788; Ex. A at 15.
[58] A220.
[59] *See generally* Ex. A.
[60] *Id.* at 16.
[61] *Id.* at 16-17.

For purposes of the ruling, the court treated these purposes as a single purpose to "investigat[e] potential wrongdoing" and found that "the investigation of mismanagement is a proper purpose under Delaware law . . . ."[62]

The court next tackled the question of whether the Stockholders had established a credible basis for inspection with respect to wrongdoing. In finding a credible basis for demand, the court stated that "[v]iewed collectively, the categories support a finding that there is a credible basis to infer that an insider trading scheme existed."[63]

Finally, the court determined the scope of relief to be granted and ultimately required NVIDIA to produce:

> (i) communications about the statements Fisher is alleged in [the Amended Securities Complaint] to have made to Huang, if any, regardless of where they are found, be it in email, or in written notes taken by Fisher, Huang, or others present for conversations between them; (ii) the Top 5 emails sent to or by Huang or Kress during the Relevant Period to the extent they relate to the Responsive Topics.[64]

## II. STANDARD OF REVIEW

On appeal, this Court applies a *de novo* standard of review to determine "which types of books and records are included in the actual written demand, except to the extent that the written demand is ambiguous and there are factual

---

[62] *Id.* at 17.
[63] *Id.* at 28.
[64] Opening Br. Ex. B, at 3 (hereinafter, "Ex. B at __").

16

determinations underlying the Court of Chancery's resolution of that ambiguity."[65]

We review questions of law, including whether a proper purpose can be established with hearsay evidence, *de novo*.[66] "When a stockholder seeks to investigate corporate wrongdoing, the Court of Chancery's determination that a credible basis to infer wrongdoing exists is a mixed finding of fact and law, to which we afford considerable deference."[67] "This Court reviews the scope of relief ordered in a books and records action for abuse of discretion."[68]

## III.   ANALYSIS

Under Section 220 of the Delaware General Corporation Law, stockholders have a right to inspect corporate books and records.[69] This right, however, is not unfettered. Section 220 first imposes strict form and manner requirements.[70] Next, the stockholder must have a proper purpose to inspect corporate books and records.[71] "A proper purpose shall mean a purpose reasonably related to such person's interest

---

[65] *KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 749 (Del. 2019).

[66] *Pipher v. Parsell*, 930 A.2d 890, 892 (Del. 2007).

[67] *AmerisourceBergen Corp. v. Lebanon Cnty. Emps.' Ret. Fund*, 243 A.3d 417, 424-25 (Del. 2020) (citing *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 287 (Del. 2010)).

[68] *AmerisourceBergen*, 243 A.3d at 425 (citing *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Tr. Fund IBEW*, 95 A.3d 1264, 1272 (Del. 2014)).

[69] 8 *Del. C.* § 220.

[70] *Id.* at 220(b).

[71] *Id.*

as a stockholder."[72] "[A] stockholder has the burden of proof to demonstrate a proper purpose by a preponderance of the evidence."[73]

"It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"[74] But where a stockholder seeks to investigation wrongdoing, the stockholder must also "show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation . . . ."[75] Finally, "[t]he [stockholder] bears the burden of proving that each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection."[76]

NVIDIA challenges whether the Stockholders have satisfied each of these requirements. First, NVIDIA argues that the Stockholders' demand for all documents forming the basis of the Public Statements is overbroad, in violation of the statute's form and manner requirements.[77] The Company also contends that the Stockholders constantly changed their requests throughout litigation, adding entirely new categories of documents in violation of the statute's form and manner

---

[72] *Id.*
[73] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).
[74] *Id.*
[75] *Id.* at 123.
[76] *Thomas & Betts Corp. v. Leviton Mfg. Co. Inc.*, 681 A.2d 1026, 1035 (Del.1996)).
[77] Opening Br. at 19.

requirements.[78]   Second, NVIDIA argues that the Stockholders' reliance on impermissible hearsay evidence to establish a proper purpose failed to meet the burden of proof required by the statute.[79]   Third, NVIDIA argues that the Stockholders did not show a credible basis from which the court could infer wrongdoing or mismanagement.[80]   Fourth, the Company alleges that the court's order of production is not essential and sufficient to the stockholders' stated purpose.[81]   We address each challenge in turn.

A.    The Stockholders' Request Does Not Violate Section 220's Form and Manner Requirements

NVIDIA argues that the Stockholders' request for documents that formed the basis of the Public Statements violates Section 220's form and manner requirements because it is impermissibly broad.[82]   The Company also contends that the Stockholders expanded their document requests throughout litigation in violation of Section 220's form and manner requirements.[83]   We disagree.

A stockholder's right to inspect the books and records of a corporation is codified in Section 220(b) of the Delaware General Corporation Law.[84]   Under the

---

[78] *Id.* at 20-24.
[79] *Id.* at 25-30.
[80] *Id.* at 31-42.
[81] *Id.* at 18-20.
[82] *Id.*
[83] Opening Br. at 20-24.
[84] 8 *Del. C.* § 220(b).

statute, "[a]ny stockholder, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right . . . to inspect for any proper purpose . . . [t]he corporation's . . . books and records . . . ."[85] Beneficial stockholders are permitted to inspect a corporation's books and records if "the demand under oath shall state the person's status as a stockholder, be accompanied by documentary evidence of beneficial ownership of the stock, and state that such documentary evidence is a true and correct copy of what it purports to be."[86] Section 220(c) provides that stockholders seeking to inspect the corporation's books and records, other than stockholder lists, "'shall first establish that: (1) [s]uch stockholder is a stockholder; (2) [s]uch stockholder has complied with [section 220] respecting the form and manner of making demand for inspection of such documents; and (3) [t]he inspection such stockholder seeks is for a proper purpose.'"[87]

As such, the statute suggests that the form and manner requirements are expressed in Section 220. They include, for example, requirements that the stockholder provide a written demand, under oath, that states the person's status as a stockholder, and for beneficial stockholders that includes documentary evidence

---

[85] *Id.*

[86] *Id.*

[87] *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 144 (Del. 2012) (quoting 8 *Del. C.* § 220(c)).

20

of beneficial ownership of the stock that states that such documentary evidence is a true and correct copy of what it purports to be. The plain language of Section 220 does not explicitly address the scope or breadth of the documents available for inspection, other than to make clear that stockholders may inspect both stockholder lists and other books and records. Simply put, a determination of the appropriateness of the scope of a stockholder's requests, or any change to the stockholder's requests, has no bearing on whether the plaintiff has satisfied the statute's form and manner requirements. To be sure, a Company can challenge the appropriateness of the scope of document requests and changes to the document requests, but we do not view those challenges as form and manner requirement challenges.

Thus, we hold that the scope of the Stockholders' requests, even if they were initially overbroad, and changes to the Stockholders' requests throughout litigation, do not violate Section 220's form and manner requirements.

The Company next appears to argue that under *Highland Select Equity Fund, L.P. v. Motient Corp.*,[88] the court does not have the "responsibility to pick through the debris" of an overbroad demand and should instead deny any overbroad demand outright.[89] In *Highland Select*, the court analyzed "whether the stockholder made a proper demand or, instead, has presented such a sweeping and overbroad request as

---

[88] 906 A.2d 156 (Del. Ch. 2006).
[89] Opening Br. 19.

21

to constitute an impermissible use of the statutory right to inspect the corporation's books and records."[90]  In denying the stockholder's request as overbroad, the court stated, "Section 220 is also not a way to circumvent discovery proceedings, and is certainly not meant to be a forum for the kinds of wide-ranging document requests permissible under Rule 34."[91]  It then noted that "it is not the court's responsibility to pick through the debris of a Section 220 demand."[92]  According to the Company, this language created a blanket rule in which the Court of Chancery must deny all demands that are overbroad.[93]

There is no blanket rule that requires the Court of Chancery to outright deny those demands that it finds to be overbroad.  In *Highland Select* the court opted not to determine which documents were necessary and essential to the stockholder's purpose after determining that the stockholder's impermissibly broad demand, coupled with its improper purpose, abused the Section 220 process.  The Court of Chancery has discretion to look at an overbroad demand and either identify the records that should be produced or to decide that it will not "pick through the debris" of an impermissibly overbroad demand that abuses the Section 220 process.  Here, the Court of Chancery did not abuse its discretion by refusing to deny the demand

---

[90] *Highland Select*, 906 A.2d at 157.
[91] *Id.* at 165.
[92] *Id.* at 168.
[93] Opening Br. 18-19.

22

outright due to its breadth. In other words, it was not an abuse of discretion for the Court of Chancery to choose to craft a production order circumscribed with rifled precision. Plaintiffs in Section 220 proceedings, however, should take heed that the deference we afford the Court of Chancery in these instances means that a Chancellor's or Vice Chancellor's denial of a demand as impermissibly overbroad will also be subject to an abuse of discretion standard and deference from this Court.

**B.** **The Stockholders Did Not Improperly Change Their Requests Throughout Litigation**

NVIDIA next argues that the Stockholders improperly changed their requests throughout litigation.[94]

Delaware case law has held that Section 220 plaintiffs cannot broaden the scope of their requests throughout litigation, as such a change would be prejudicial to the corporate defendant. For example, in *Fuchs Family Trust v. Parker Drilling Company*, the Court of Chancery denied the plaintiff's inspection demand because the plaintiff attempted to broaden its request eight days before trial and after briefing:

> On November 4, 2014, just eight days before trial, Fuchs issued a supplemental inspection demand, to provide, in part, sufficient proof of its beneficial ownership of Parker stock. In addition to requesting documents sufficient to identify the anonymous wrongdoers, Fuchs attempted to broaden its demand (shortly before trial and after briefing had commenced) to include any report prepared by Parker's board, or any committee thereof, concerning investigation of the Nigerian Bribing Scheme, and all

---

[94] *Id*. at 20-24.

documents relied upon by the board or any committee thereof. Given the circumstances, Fuchs's late attempt to expand its inspection must be rejected.[95]

But Delaware case law has also held that Section 220 plaintiffs may narrow their requests throughout litigation when the narrowing is made in good faith:

> While Plaintiffs' lack of precision in formulating its Demand, particularly with respect to the scope of documents requested, has provoked justified frustration and has prompted questions regarding possible abuse of the Section 220 process, I am satisfied there has been no such abuse here. Plaintiffs' stated purposes for inspection have remained constant throughout the various iterations of their Demand. And their lack of focus regarding the documents they seek, while unfortunate, does not evidence a lack of good faith. In my view, the proper approach here is to hold Plaintiffs to the request for documents as stated in the Pre-Trial Order, a request that was refined by the parties' several meet and confer sessions.[96]

Thus, under Delaware case law, Section 220 plaintiffs may narrow their requests during litigation if they do so in good faith and such narrowing is not prejudicial to the company.

In one of the Original Demands made upon NVIDIA, the Stockholders sought the following: "All documents forming the basis, if any, for NVIDIA's public statements about its ability to manage the inventory, supply chain and sales channel concerns around the cryptocurrency boom experienced by NVIDIA during the time

[95] *Fuchs Fam. Tr. v. Parker Drilling Co.*, 2015 WL 1036106, at *4 (Del. Ch. Mar. 4, 2015).
[96] *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *18 (Del. Ch. May 30, 2019).

24

period from 2017 to 2019."[97]  Before litigation, on May 28, 2019, the Stockholders sent NVIDIA the Consolidated Demands, the first of which requests "[a]ll documents and/or communications used by NVIDIA's CEO, CFO and/or other executives with direct reporting responsibilities to the Board concerning the demand for the Company's GPUs, GPU inventory levels, sales channel conditions and other key business metrics monitored by the NVIDIA Board during the time period from 2017 to 2019."[98]  Although the wording is slightly different, the gist of the request remains the same—the Stockholders want documents and communications used by NVIDIA's executives that informed the Public Statements regarding NVIDIA's ability to manage its supply chain and cryptocurrency demand.

On September 24, 2019, before this litigation began, the Stockholders again reiterated their request: "Accordingly, the Stockholders demand to know by the close of business on October 1, 2019, whether NVIDIA will be producing the documents that formed the basis of Huang's and Kress's public statements about the Company's ability to manage its GPU sales considering the increased cryptocurrency demand . . . ."[99]

In the complaint, the Stockholders made the exact same request, seeking "only the documents that formed the basis of Huang's and Kress's public statements about

---

[97] A663.
[98] A675-76.
[99] A686.

the Company's ability to manage both its GPU inventory levels and sales channels considering the increased demand in GPUs was a product of cryptocurrency demand and not traditional gaming."[100]

In the pre-trial order and stipulation, the Stockholders sought "documents (including email) from the period of August 2017 and November 2018 received or authored by Huang and or any member of NVIDIA's Board or Officers/senior members of management relating to . . . *the impact of cryptocurrency on the GPU market*," "*the Company's sales of GPUs between August 2017 and November 2018*" and "*the Company's strategy with respect to cryptocurrency*."[101]  This request is consistent with the request for those documents forming the basis of the Public Statements, as all of the Public Statements relate to "the impact of cryptocurrency on the GPU market" and "the Company's strategy with respect to cryptocurrency." But this request also is narrower because it identifies potential custodians of responsive documents and shortens the time period in which those documents might have been received or authored.

In their post-trial brief, the Stockholders further narrowed their request by identifying five specific categories of documents (the "Five Requests"):

> (1) sales data specifically identifying and quantifying global GeForce sales to cryptominers consolidated in a central database that Huang had access to; (2) documents

---

[100] A38.
[101] A791-92 (emphasis added).

pertaining to quarterly internal meetings in which NVIDIA's vice presidents presented crypto specific GeForce sales to Huang, particularly from Fisher, Alben, and Tomassi, not dozens of insiders; (3) weekly reports sent directly to Huang, at his request, detailing cryptominers' voracious demands for GeForce GPUs from regions around the world; (4) usage data from a software program bundled into the GeForce GPUs, called GeForce Experience, which reflected how the processors were being utilized by end users that was compiled in monthly reports sent to Huang, and accessed by Kress; and (5) weekly sales emails quantifying GeForce sales to cryptominers in NVIDIA's largest market in an internal study.[102]

These categories of documents fall within the pre-trial order and stipulation's request for documents relating to "the impact of cryptocurrency on the GPU market" and "the Company's strategy with respect to cryptocurrency." But based on information learned in the Amended Securities Complaint, the Stockholders identified precise topics, meetings, reports, data, and documents that relate to NVIDIA's control of the channel in light of the increase in cryptocurrency mining.

As such, an examination of the Stockholders' requests throughout litigation reveals that they did not broaden their requests; instead, they consistently sought those records and communications that formed the basis of the Public Statements.

---

[102] A881-82.

And any changes to the Stockholders' requests had the effect of narrowing exactly which documents and records might fulfill that demand.[103]

If a Section 220 plaintiff's overarching request remains the same, the plaintiff may narrow the scope of that request throughout litigation, if such narrowing does not prejudice the defendant.[104] Notably, the Company does not argue that it was prejudiced by the Stockholders narrowing requests.

The Company makes a final argument on this point that we are compelled to address. The Company argues that the Stockholders' improperly and constantly changing requests confused the Court of Chancery and caused it to order the production of records that do not exist.[105] We disagree.

As an initial matter, we reiterate that the Stockholders' request was narrowed, not broadened or completely changed, for the reasons stated above. Next, we note that the Court of Chancery was far from confused. The Amended Securities Complaint contains allegations from an anonymous former employee who "was

---

[103] We note that the Company faults the Stockholders for not identifying these specific records from the outset. But the information that allowed the Stockholders to narrow its requests was not available at the time of the Original Demand or the Consolidated Demand. The Stockholders created their Five Requests based on information alleged in the Amended Securities Complaint about (1) communications between Fisher and Huang regarding the effect of cryptocurrency on the channel, as alleged by a former NVIDIA employee, and (2) the Top 5 emails. The Amended Securities Complaint was not filed until May 2020, which occurred after the Original and Consolidated Demands. In other words, the Company asks us to rule that the Stockholders should have identified a specific set of records it did not know existed until after it made its Original Demand. We decline to do so.

[104] *See In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at \*18.

[105] Opening Br. 21-23.

employed by NVIDIA for over 10 years as a Senior Account Manager in China . . . ."[106] The Amended Securities Complaint states that this former employee gave "a presentation in March 2017 to other high-level NVIDIA executives—including Fisher []—that emphasized the explosion of crypto-related sales of GeForce GPUs in China and reported that sales to crypto miners had caused GeForce sales to almost double in a short period. At this meeting, Fisher called crypto-related demand 'dangerous.'"[107] Moreover, the Amended Securities Complaint claims a close relationship existed between Fisher and Huang:

> Huang and Kress had ready access to Fisher, whose office was no more than 100 yards from Huang's, who met with Huang on a weekly basis, and who, as described above, received detailed crypto specific GeForce sales data on a weekly and quarterly basis, traveled to China to review the effect of crypto-related demand on GeForce sales, and commissioned a study that quantified sales to miners on a monthly basis in China and addressed how NVIDIA could exploit the trend.[108]

The Amended Securities Complaint then states that "[i]t is absurd to think that Fisher did not relay this data to Huang or otherwise discuss the effect of crypto related demand—which he deemed 'dangerous'—on the Gaming segment, which was NVIDIA's most important business unit and the source of more than half of the

---

[106] A706.
[107] A767.
[108] *Id.*

Company's revenues."[109]  Essentially, the Amended Securities Complaint stops a hair short of alleging that Fisher told Huang about the "dangerous" effect of crypto mining on the channel.  Given the allegations in the Amended Securities Complaint, it was reasonable for the Court of Chancery to infer that Fisher and Huang communicated about topics detailed in the Five Requests.

Moreover, it is likely because the court makes this inference that the court's order only requires the production of communications between Huang and Fisher to the extent they exist: "communications about the statements Fisher is alleged in [the Amended Securities Complaint] to have made to Huang, *if any* . . . ."[110]

Thus, the Court of Chancery was not confused by the Stockholders' request and did not err in determining that the Stockholders' Five Topics request narrowed their original request.[111]

## C. Although Sufficiently Reliable Hearsay Is Admissible in a Section 220 Action, the Court of Chancery Erred by Allowing Stockholders to Establish Their Purpose with Hearsay Evidence in This Case

In its opinion, the Court of Chancery held that that the Stockholders could establish a proper purpose through hearsay statements contained in their demand

---

[109] A767-68.

[110] Ex. B at 3.

[111] The Company also alleges that the Court of Chancery erred in ordering the production of documents that the Stockholders did not request in their complaint or pre-litigation demands.  Given our holding that the Five Requests are encompassed within the pre-litigation demands, we need not address this argument.

letters and interrogatory responses. In coming to this conclusion, the court first analyzed the nature of Section 220 actions, noting that the statute imposes form and manner requirements and gives the Court of Chancery discretion to resolve such actions as summary proceedings.[112] The court then observed that "[s]ummary proceedings are a special type of proceeding under Delaware law. Delaware courts have interpreted the statutory designation to mean[] that judges should aim to resolve the action 'expeditiously,' as our high court explained in *AmerisourceBergen*."[113] The court noted that requiring Section 220 plaintiffs to establish a proper purpose without hearsay, absent a stipulation to proceed on a paper record, would amount to a requirement that all Section 220 plaintiffs testify live at trial, resulting in "inefficiency in the process."[114] The court then held that the Original Demands are sufficient to establish a proper purpose because they state that the Stockholders want to investigate possible wrongdoing, comply with the form and manner requirements, are made under oath and under penalty of perjury, and are accompanied by power of attorney.[115]

The Company argues that the Court of Chancery erred in allowing the Stockholders to establish a proper purpose with their demand letters and

---

[112] Ex. A at 20.
[113] *Id.*
[114] Ex. A at 23-24.
[115] *Id.* at 24-25.

interrogatory responses because those pieces of evidence are inadmissible hearsay.[116] And because the Delaware Uniform Rules of Evidence apply in all actions and proceedings in Delaware courts, without an exception for Section 220 proceedings, the court erred in accepting inadmissible hearsay as competent evidence of a proper purpose.[117] The Company also argues that requiring live testimony from Section 220 plaintiffs would not result in any meaningful delay; but even if inefficiencies were a legitimate concern, the Company contends that is no justification to set aside the rules of evidence.[118] The Company further avers that the inadmissible hearsay was no longer reliable evidence of Stockholders' purpose because "trial occurred about 19 months after [Stockholders] identified their purpose in their [Original] Demands" and, during that time, "NVIDIA's stock price more than doubled, and the channel inventory issue had proven to be short-lived."[119]

In response, the Stockholders argue that Delaware case law permits the use of hearsay in a Section 220 proceeding so long as the hearsay is sufficiently reliable.[120] The Stockholders add that Delaware case law "imposes no . . . limitation on the ways sufficiently reliable hearsay may be used in a books and records

---

[116] Opening Br. 25-30.
[117] *Id.* at 26.
[118] *Id.* at 28.
[119] *Id.* at 30.
[120] Answering Br. 27-30.

proceeding."[121]   The Stockholders then aver that the Original Demands are sufficiently reliable because they are made under penalty of perjury and that their verified complaint, which restated their purpose, was notarized and attested to the correctness and truthfulness of the filing.[122]  The Stockholders contend that because they submitted multiple sworn statements of their proper purpose, their burden was satisfied and that the Company now carries the burden of proving that their purpose was not proper.[123]

Delaware Uniform Rules of Evidence, Rule 1101(a) provides that the Rules of Evidence "apply to all actions and proceedings in all the courts of [Delaware]." Rule 1101(b) outlines exceptions, but no one argues that those exceptions apply here. Rule 801(c) defines hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement."[124]  The parties agree that the Stockholders' statements of a proper purpose, which are made in the Original Demands and the interrogatories, are out-of-court statements.  They also agree that the statements are offered for the truth of the matter asserted—that the Stockholders want the documents for the purpose of investigating wrongdoing.  Thus, the parties

---

[121] *Id.* at 28.
[122] *Id.* at 30-31.
[123] *Id.* at 31-32.
[124] D.R.E. 801(c).

agree that the statements at issue are hearsay. Rule 802 provides that "[h]earsay is not admissible except as provided by law or by the[] Rules." The parties do not argue that any exception provided in the Rules applies here. Thus, the parties agree that, under the plain language of the Rules, the Original Demands and interrogatories are not admissible to show the stockholder's proper purpose. The parties dispute, however, whether there is (or should be) an exception, by law, that would permit the Stockholders to rely on hearsay evidence in a books and records action to establish a proper purpose.

To answer this question, the parties focus on a line of cases from the Court of Chancery (stretching back for at least eighteen years) that holds that hearsay is admissible in books and records litigation to show that a credible basis to infer wrongdoing exists.[125] These cases rely on this Court's ruling in *Thomas & Betts*

---

[125] Opening Br. 25-28; Answering Br. 27-30; *see Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 778 (Del. Ch. 2016); *accord Gross v. Biogen Inc.*, 2021 WL 1399282, at *9 (Del. Ch. Apr. 14, 2021); *Jacob v. Bloom Energy Corp.*, 2021 WL 733438, at *1 n.10 (Del. Ch. Feb. 25, 2021); *Georgia Notes 18, LLC v. Net Element, Inc.*, No. 2021-0246-JRS, at *7-8 (Del. Ch. Aug. 31, 2021); *Pettry v. Gilead Sciences, Inc.*, 2020 WL 6870461, at *11 (Del. Ch. Nov. 24, 2020); *Woods Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, 238 A.3d 879, 894 (Del. Ch. 2020); *Brown v. Empire Resorts*, No. 2019-0908-KSJM, at *35 (Del. Ch. Feb. 20, 2020); *Lapetus Cap. II LLC v. Verso Corp.*, No. 2019-1040-KSJM, at *21 (Del. Ch. Jan. 17, 2020); *AmerisourceBergen Corp.*, 2020 WL 132752, at *8 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020); *Bucks Cnty. Emps. Ret. Fund v. CBS Corp.*, 2019 WL 6311106, at *2 n.14 (Del. Ch. Nov. 25, 2019); *Southeastern Pa. Transp. Auth. v. Facebook, Inc.*, 2019 WL 5579488, at *2 n.7 (Del. Ch. Oct. 29, 2019); *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *2 n.10; *In re UnitedHealth Grp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *6 (Del. Ch. Feb. 28, 2018), *aff'd*, 196 A.3d 885 (Table) (Del. 2018); *In re Plains All Am. Pipeline, L.P.*, 2017 WL 6016570, at *2 (Del. Ch. Aug. 8, 2017); *Elow v. Express Scripts Holding Co.*, 2017 WL 2352151, at *5 (Del. Ch. May

*Corp. v. Leviton Mfg. Co., Inc.*[126]  The Court of Chancery has interpreted that case

as refusing to accept hearsay in a Section 220 action to show a credible basis because

it was "unreliable."[127]  Thus, the argument goes, if hearsay is sufficiently reliable, it

can be used to show a credible basis.

In *Thomas & Betts*, the plaintiff corporation, Thomas & Betts, desired to either

acquire or pursue a joint venture with the defendant corporation, Leviton.[128]  After

preliminary negotiations proved unfruitful, the plaintiff purchased a 29.1 percent

stake in Leviton from one of Leviton's employees and former group vice president,

Thomas Blumberg.[129]  Blumberg also provided the plaintiff with confidential

internal Leviton documents and disclosed information about Leviton's internal

strategies and accounting figures.[130]  After the plaintiff acquired a minority stake in

Leviton, it attempted to negotiate an amicable working relationship with Leviton,

which was rebuffed.[131]  At that point, the plaintiff served the defendant with a

demand seeking inspection of ten categories of documents.[132]  The plaintiff then

---

31, 2017); *Walther v. ITT Educ. Servs., Inc.*, 2015 WL 545331, at *6 (Del. Ch. Feb. 10, 2015); *Paul v. China MediaExpress Holdings, Inc.*, 2012 WL 28818, at *5 (Del. Ch. Jan. 5, 2012); *Troy Corp. v. Schoon*, 959 A.2d 1130, 1135 (Del. Ch. 2008); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4 (Del. Ch. Apr. 28, 2004).
[126] 681 A.2d 1026 (Del. 1996).
[127] *Yahoo! Inc.*, 132 A.3d at 778.
[128] *Thomas & Betts*, 681 A.2d at 1028.
[129] *Id.* at 1028-29.
[130] *Id.* at 1029.
[131] *Id.*
[132] *Id.*

offered, yet again, to buy the remainder of Leviton's shares, threatening litigation if the final offer was rejected.[133]  Leviton refused the offer and the inspection demand.[134] The plaintiff then filed a Section 220 action seeking to compel inspection of the defendant's books and records, stating that its purpose was to investigate waste and mismanagement.  To show a credible basis for its purpose, the plaintiffs offered witness testimony from its own employees who relayed the discussions they had with Blumberg regarding Leviton's accounting mismanagement.[135]  The court characterized these statements as hearsay.[136]

The Court of Chancery denied the plaintiff's request for two reasons: (1) the plaintiff was not motivated by its stated purpose, but was actually attempting to acquire Leviton; and (2) the plaintiff did not show a credible basis for mismanagement because it did not meet a "greater-than-normal evidentiary burden."[137]  On appeal, the plaintiff argued that the Court of Chancery applied the wrong legal standard for showing a credible basis and that the Court of Chancery incorrectly determined that the testimonial evidence presented to show a credible basis was hearsay.[138]

---

[133] *Id.*
[134] *Id.*
[135] *Id.* at 1031.
[136] *Id.*
[137] *Id.* at 1030-31.
[138] *Id.* at 1031.

On appeal, the Supreme Court held that the Court of Chancery correctly determined that the testimony contained hearsay, but the Supreme Court held that the Court of Chancery applied the wrong legal standard. Applying the correct legal standard and addressing the hearsay evidence, the Court reasoned that "as the trial court found, Blumberg was actively engaged in the process of defecting to the Thomas & Betts camp. Statements made in this context lack independent guarantees of trustworthiness and are inherently unreliable."[139] The Court then noted that "[m]*ore significantly, the trial court did not exclude this testimony*. Rather, the Vice Chancellor heard the testimony and found it unworthy of belief. In this posture, plaintiff's evidentiary objections carry little weight."[140]

Next, the Court considered another Court of Chancery case that it determined admitted hearsay testimony in the context of examining the purpose of the demand. The Court stated, "Similarly, Thomas & Betts' citation to *Skoglund v. Ormand Industries* is unavailing . . . . As in the case at bar, the *Skoglund* court allowed hearsay testimony regarding statements made by a corporate insider. Unlike the instant case, however, the trial court in *Skoglund* chose to credit that testimony as worthy of belief."[141] Thus, the Court ruled that the hearsay evidence in *Thomas & Betts* could not be used, not because it was inadmissible hearsay, but because it was

---

[139] *Id.*
[140] *Id.* at 1032 (emphasis added).
[141] *Id.* at 1032 (citing *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204 (Del. Ch. 1976).

unreliable. Stated differently, when faced with a direct question regarding the admissibility of hearsay evidence in a books and records action, the Court examined two cases, one that considered the hearsay evidence in the context of examining the stockholder's purpose and one that did not consider the hearsay evidence in the context of examining the credible basis. The Court then ruled that the analysis regarding admissibility turned, not on the fact that the testimony was inadmissible hearsay, but instead on the reliability of the evidence.

Thus, it appears to us, that this Court, twenty-six years ago, created an exception in the 220 context that allows the use of sufficiently reliable hearsay in books and records actions. The Court of Chancery has applied this exception many times since that ruling. That this exception encompasses more than just the credible basis context seems inherent in this Court's reference to *Skoglund*, a case in which sufficiently reliable hearsay was permitted to show the stockholder's purpose. In laying out the hearsay exception for showing a credible basis, this Court noted that it was ruling differently than *Skoglund* because of the reliability of the hearsay—not because of what the hearsay was being used to show. If this Court wanted to limit the hearsay exception to the credible basis context, it would not have used *Skoglund* approvingly as a point of comparison. As such, it appears to us that *Thomas & Betts* has provided an answer to the hearsay issue: hearsay is admissible in a Section 220 proceeding when that hearsay is sufficiently reliable.

38

We note that the Company does not argue that *Thomas & Betts* was wrongly decided and does not ask us to revisit that decision. The Company does not argue that the numerous cases since *Thomas & Betts* that hold that hearsay is admissible in 220 actions are wrongly decided.[142] Instead, the Company argues that the Chancery cases relying on *Thomas & Betts* should not be extended to apply to the proper purpose requirement. However, as mentioned above, *Thomas & Betts* stands for the proposition that hearsay is admissible in a Section 220 action if it is sufficiently reliable; and the ruling does not appear to be limited to the credible basis context. We are not inclined to reconsider *Thomas & Betts* when neither party has asked us to do so. Moreover, because overruling precedent requires a complex analysis that involves consideration of factors such as reliance interests, the

---

[142] *See e.g. Yahoo! Inc.*, 132 A.3d at 778; *accord Biogen Inc.*, 2021 WL 1399282, at *9; *Bloom Energy Corp.*, 2021 WL 733438, at *1 n.10; *Georgia Notes 18, LLC*, No. 2021-0246-JRS, at *7-8; *Gilead Sciences, Inc.*, 2020 WL 6870461, at *11; *Woods Tr. of Avery L. Woods Tr.*, 238 A.3d at 894; *Empire Resorts*, No. 2019-0908-KSJM, at *35; *Lapetus Cap. II LLC*, No. 2019-1040-KSJM, at *21; *AmerisourceBergen Corp.*, 2020 WL 132752, at *8, *aff'd*, 243 A.3d 417 (Del. 2020); *Bucks Cnty. Emps. Ret. Fund*, 2019 WL 6311106, at *2 n.14; *Southeastern Pa. Transp. Auth.*, 2019 WL 5579488, at *2 n.7; *In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *2 n.10; *In re UnitedHealth Grp., Inc. Section 220 Litig.*, 2018 WL 1110849, at *6, *aff'd*, 196 A.3d 885 (Table) (Del. 2018); *In re Plains All Am. Pipeline, L.P.*, 2017 WL 6016570, at *2; *Elow v. Express Scripts Holding Co.*, 2017 WL 2352151, at *5; *ITT Educ. Servs., Inc.*, 2015 WL 545331, at *6; *China MediaExpress Holdings, Inc.*, 2012 WL 28818, at *5; *Schoon*, 959 A.2d at 1135; *Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *4.

workability of the precedent, and the age of the precedent,[143] we decline to overrule *Thomas & Betts* without proper briefing and arguments on those points.

The Company next argues that even if a Section 220 plaintiff can rely on sufficiently reliable hearsay to show a proper purpose, the evidence submitted here should be excluded for two reasons: (1) the Stockholders deprived the Company of its ability to test that purpose through cross-examination by using misleading tactics as to their plans regarding witnesses; and (2) the evidence is unreliable.[144]

It is established that a company in a Section 220 action has a right to depose the stockholder.[145] It is also clear that these depositions can be and often are used to test the stockholder's stated purpose.[146] In this case, the Company asked the Stockholders to provide a list of persons they intended to call as witnesses in order for the Company to depose those persons identified.[147] The Stockholders then suggested that they were considering affidavits in lieu of live testimony; the

---

[143] *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1278 (Del. 2021) (laying out the factors that should be considered when re-examining a question of law in a prior case).

[144] Opening Br. 29-30.

[145] *McCarthy v. Cablevision Sys. Corp.*, 2007 WL 1309399, at *1 (Del. Ch. Apr. 24, 2007) ("Defendant is entitled to depose the plaintiff in a § 220 proceeding, unless there is evidence of abuse of process, alternative means of equivalent discovery, or improper delay."); *see Arbitrium Handels AG v. Technicorp Int'l II, Inc.*, 1994 WL 89017, at *1 (Del. Ch. Feb. 4, 1994).

[146] *See Meltzer v. CNET Networks, Inc.*, 2007 WL 2593065, at *2 (Del. Ch. Sept. 6, 2007) ("For similar reasons, CNET must also be permitted to ask plaintiffs questions about their purpose for bringing this action.").

[147] A787.

Company did not agree. Instead, the Company stated that it would need to first see the affidavits in order to decide, yet again, whether to depose the affiants.[148] The Stockholders, however, failed to identify any witnesses by the deadline articulated in the scheduling order.[149] The Stockholders also failed to produce any affidavits for the Company's review.[150] Eight days after the deadline to identify trial witnesses, and only in response to an email from the Company alleging that the Stockholders could not "meet [their] burden of proof without testimony," the Stockholders responded to the Company's email by suggesting that they would *discuss* the Company taking the deposition testimony of certain Stockholders.[151] At that point, the Company made the strategic decision to raise the issue to the Court of Chancery.[152]

The hearsay exception articulated above inures to the benefit of Section 220 plaintiffs. That benefit, however, should not be abused. Plaintiffs in a Section 220 proceeding must be upfront about their plans regarding witnesses. Such transparency ensures that companies can choose whether to depose the stockholders during discovery or call the stockholders as witnesses at trial. Here, the Stockholders deprived the Company of the ability to test the Stockholders' stated purpose by

---

[148] A788.
[149] A788-93.
[150] A788.
[151] A801.
[152] A801-02.

refusing to cooperate with the Company regarding the identification of trial witnesses or affiants. This type of behavior creates the potential for gamesmanship, which should be discouraged. If stockholders are going to introduce sufficiently reliable hearsay to establish a proper purpose, they must communicate honestly and early with companies regarding their intent so as to allow companies to decide whether to depose the stockholders or to identify their own witnesses for trial.

This concern is especially critical here because the Company raised reasons to doubt the reliability of the evidence of the Stockholders' purpose. As the Company stated, "trial occurred about 19 months after [the Stockholders] identified their purpose in their [Original Demands]. During that time, NVIDIA's stock price more than doubled, and the channel inventory issue had proven to be short-lived."[153] Although the Company points to these facts and challenges the reliability of the hearsay, we need not decide that particular issue because we hold that a stockholder cannot hide its intent to rely on demands in what appears to be an effort to deprive the company of its right to examine the stockholder through depositions or otherwise.

Therefore, we reverse the Court of Chancery's holding that the Stockholders could show a proper purpose by relying on the Original Demands and interrogatories—not because sufficiently reliable hearsay may not be used to show

---

[153] Opening Br. at 30.

a proper purpose but because the Stockholders deprived the Company of its ability to test that purpose through depositions or otherwise—and remand for further proceedings consistent with this opinion. Because we have found that the Stockholders deprived the Company of its ability to test the Stockholders' purpose, requiring a remand, we need not address the remaining arguments. Nonetheless, we do so in the interest of efficiency on remand.

### D. The Court of Chancery Did Not Err by Concluding That the Stockholders Proved a Credible Basis to Infer Wrongdoing

The Stockholders relied on the following evidence to show a credible basis from which to infer wrongdoing: (1) NVIDIA's response to the cryptocurrency demand, (2) the Public Statements, (3) the sale of personally held stock by Huang, Kress, and other NVIDIA insiders, (4) NVIDIA's revision of its revenue guidelines, and (5) the Securities Class Action.[154] The Court of Chancery grouped the evidence into the following three categories: (1) false or misleading public statements, (2) the securities litigation, and (3) insider stock sales.[155]

The Company argues that the Court of Chancery erred in holding that the Stockholders established a credible basis to suspect wrongdoing because none of the Stockholders' evidence, individually or collectively, is enough to infer an insider

---

[154] Ex. A at 28.
[155] *Id.*

trading scheme.[156] As it relates to the stock sales, NVIDIA argues that the sales were not suspicious given the small amount of stock sold and the fact that the sales were made pursuant to 10b-5 plans.[157] As to the Securities Class Action, the Company alleges that it cannot be used to infer wrongdoing because it did not contain allegations about insider trading.[158] And as to the Public Statements, the Company contends that they do not give rise to an inference of wrongdoing because they are either forward-looking, objectively accurate, or immaterial.[159]

In response, the Stockholders argue that the court correctly determined that they needed to show a credible basis to infer wrongdoing or mismanagement, not just insider trading.[160] Thus, they contend, NVIDIA improperly "limits the reasoning of the Court of Chancery to a single purpose and to a specific iron-clad theory of NVIDIA's wrongdoing."[161] The Stockholders aver, and the Court of Chancery agreed, that the court could infer that the timing and size of the stock sales were suspicious, despite being made pursuant to a 10b-5 plan.[162] The Stockholders argue, and the lower court agreed, that the Public Statements, when viewed in light of other circumstances—such as Huang and Kress' unfulfilled projections

---

[156] Opening Br. 31-32.
[157] *Id.* at 33-35.
[158] *Id.* at 36-38.
[159] *Id.* at 39-42.
[160] Answering Br. 36-37.
[161] *Id.* at 37.
[162] *Id.* at 39-41; Ex. A at 32-34.

concerning NVIDIA's ability to meet mining demands, the inventory backlog, and the stock sales—support an inference of wrongdoing.[163]  Finally, the Stockholders argue, and the Court of Chancery agreed, that the Amended Securities Complaint supports an inference of wrongdoing because it alleges that Huang and Kress were aware of the discrepancy in demand between Crypto GPUs and Gaming GPUs.[164]

In holding that the Stockholders met the low burden of showing a credible basis from which to infer the possibility of wrongdoing, the court weighed the evidence collectively, noting:

> At this stage, I must simply be able to "connect the dots" in order to be able to reasonably infer the possibility of wrongdoing.  As this Court held in *Sprouts*, considering [Stockholders] have presented evidence of insider stock sales, public statements that may have been false or misleading, and concurrent securities litigation that is bolstered by allegations supported by ample research, I can connect the dots here regarding the picture that [Stockholders] seek to portray of a possible insider trading scheme at NVIDIA.[165]

The Stockholders' asserted purpose for seeking books and records is to investigate wrongdoing or mismanagement.[166]  "[I]nvestigating corporate waste, mismanagement, or wrongdoing is a proper purpose for which to demand inspection

---

[163] Answering Br. at 41-43; Ex. A at 28-30.
[164] Answering Br. at 43-45; Ex. A at 30-32.
[165] Ex. A at 34 (citing *Barnes v. Sprouts Farmers Mkt., Inc.*, 2018 WL 3471351 (Del. Ch. Jul. 18, 2018).
[166] A114.

of books and records."[167] "[A] stockholder whose stated purpose is investigating mismanagement must provide 'some evidence' to suggest a 'credible basis' from which this Court may infer possible mismanagement, waste, or wrongdoing may have occurred."[168] This standard does not require stockholders to show actual waste or mismanagement.[169] "Stockholders need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation . . . ."[170] The credible basis "threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[171] It is "the lowest possible burden of proof" under Delaware law.[172]

As an initial matter, we disagree with the Company that the Court of Chancery should have determined whether Stockholders showed a credible basis solely on the grounds of insider trading. When showing a credible basis for possible wrongdoing, Section 220 plaintiffs are not confined to a single theory and "need not identify the particular course of action the stockholder will take . . . ."[173]

---

[167] *Beatrice Corwin Living Irrevocable Tr. v. Pfizer, Inc.*, 2016 WL 4548101, at *4 (Del. Ch. Aug. 31, 2016).
[168] *Id.* (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del. 2006)).
[169] *Seinfeld*, 909 A.2d at 123.
[170] *Id.*
[171] *Id.* (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)).
[172] *Id.*
[173] *AmerisourceBergen*, 243 A.3d at 421.

Further, while each category of evidence individually might not be sufficient to establish a credible basis to suspect wrongdoing, when viewed collectively, we cannot conclude that the Court of Chancery abused its discretion in determining that the Stockholders established a credible basis for inspection. When the Public Statements are overlaid on the stock sales and viewed in light of the allegations from the Amended Securities Complaint—that Huang and Kress were given data informing them of the incongruity in the demand between Crypto GPUs and Gaming GPUs—it is possible to infer that Huang and Kress knowingly made false or misleading statements that boosted NVIDIA's stock price shortly before selling stock. In other words, when looking at the Public Statements, stock sales, and the Amended Securities Complaint collectively, we cannot conclude that the Court of Chancery erred. It did not abuse its discretion in determining that the Stockholders sufficiently showed that Huang and Kress were informed that there would be a lack of demand for Gaming GPUs after the crypto mining boost and used that information to bolster NVIDIA stock prices by making false or misleading statements about the demand for Gaming GPUs before selling stock at the bolstered stock price. While this evidence likely would fall far short of that necessary to support an actual claim, we cannot say that it is insufficient to meet the lowest possible burden of proof—a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation.

47

Thus, we affirm the Court of Chancery's holding that the Stockholders properly demonstrated a credible basis for inspection.

## E. The Court of Chancery Did Not Err in Determining That the Records Ordered to Be Produced Are Essential and Sufficient to the Stockholders' Stated Purpose

NVIDIA argues that even if the Stockholders have properly narrowed the scope of their requests, "there is no evidentiary basis for finding that [the court's ordered] documents are 'necessary, essential and sufficient' for [Stockholders'] stated purpose."[174]

A Section 220 plaintiff's right to inspection is limited to those records that are "'essential and sufficient to the stockholder's stated purpose.'"[175] "That determination is "'fact specific and will necessarily depend on the context in which the shareholder's inspection demand arises.'"[176] "The plaintiff bears the burden of proving that each category of books and records is essential to the accomplishment of the stockholder's articulated purpose for the inspection."[177] "A document is "essential" for Section 220 purposes if, at a minimum, it addresses the crux of the

---

[174] Ex. A at 23. The Company also avers that it was error for the Court of Chancery to order NVIDIA to produce documents that the Stockholders did not request prior to litigation. In other words, the Company believes that the scope of relief granted by the Court of Chancery exceeds the Original Demands. Given our holding that the Stockholders did not reformulate their requests throughout litigation, we need not address this argument.

[175] *KT4 Partners LLC*, 203 A.3d at 752 (Del. 2019) (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 681 A.2d 1026, 1034 (Del. 1996)).

[176] *Id.* at 751 (quoting *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 372 (Del. 2011)).

[177] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 569 (Del. 1997).

stockholder's purpose, and if the essential information the document contains is unavailable from another source."[178] "Keeping in mind that Section 220 inspections are not tantamount to 'comprehensive discovery,' the Court of Chancery must tailor its order for inspection . . . . In other words, the court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'"[179] This Court, in reviewing the Court of Chancery's scope of relief, will only reverse the court's order if it is an abuse of discretion.[180] And "[w]hether any Informal Board Materials or Officer-Level Materials [or emails] are necessary and essential awaits the Court of Chancery's 'fact specific' determination, which is committed to the court's sound discretion."[181]

In determining whether the Stockholders' request was essential and sufficient, the Court of Chancery first detailed the Five Requests demanded by the Stockholders.[182] The court then identified the three types of records the Stockholders sought to cover: "formal board materials, informal board materials and officer-level materials, and electronic communications that might cross those categories . . . ."[183]

---

[178] *Espinoza*, 32 A.3d at 371-72 (Del. 2011).
[179] *KT4 Partners*, 203 A.3d at 751-52.
[180] *AmerisourceBergen*, 243 A.3d at 425 (citing *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Trust Fund IBEW*, 95 A.3d 1264, 1272 (Del. 2014)).
[181] *AmerisourceBergen*, 243 A.3d at 439.
[182] Ex. A at 35-36.
[183] *Id.*

The court next noted that even though NVIDIA produced all formal board materials relating to the covered topics, informal board materials and officer-level materials relating to Huang's communications with Fisher were necessary because of specific and concrete allegations in the Amended Securities Complaint that Huang and Fisher communicated about cryptocurrency and its impact on NVIDIA—the subject matter of the Stockholders' request.[184] Thus, the court found that *any* documents reflecting these communications, as alleged in the Amended Securities Complaint, were "necessary and essential because they address the crux of the [Stockholders'] purposes and they are unavailable from any other source."[185] The court next held that the production of certain emails, the Top 5 emails, was necessary and essential because the Stockholders presented evidence suggesting that Huang and Kress received and responded to emails that covered the requested topics.[186] In particular, the court noted that the Top 5 emails detailed in the Amended Securities Complaint covered the impact of crypto-related demand on NVIDIA's sales in various markets, which is encompassed by the topics from the Five Requests:

> In particular, the Amended Securities Complaint lists the "Top 5" emails sent to NVIDIA executives that detailed NVIDIA's performance in various markets, as well as weekly Gaming GPU sales reports sent to NVIDIA executives. . . . I view this as a discrete category, these emails that Huang and Kress supposedly sent, the Top 5

---

[184] *Id.* at 38-40.
[185] *Id.* at 40.
[186] *Id.* at 42.

emails sent to NVIDIA executives, that would be easily gathered, *cover the topics*, and seem, to me, necessary and essential to meet the [Stockholders'] stated purposes.[187]

Thus, because both categories of the ordered documents derive from the evidence presented by the Stockholders and directly relate to the topics detailed in the Five Requests, the record does not support NVIDIA's assertion that the production order fails to satisfy the "essential and sufficient" standard. "Whether any Informal Board Materials or Officer-Level Materials [or emails] are necessary and essential awaits the Court of Chancery's 'fact specific' determination, which is committed to the court's sound discretion."[188] As such, we cannot hold that the court erred in ordering the production of those records.

Thus, we affirm the judgment of the Court of Chancery on this issue.

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

---

[187] *Id.* at 43 (emphasis added). We also note that even though the Stockholders did not request the Top 5 emails by name until the settlement demand, it was not abuse of discretion for the court to determine that the Top 5 emails fit the description of one or more categories of records from the Five Requests. Thus, the Court of Chancery did not abuse its discretion in ordering the Company to produce these documents.

[188] *AmerisourceBergen*, 243 A.3d at 439.

**TRAYNOR**, Justice, concurring:

I concur in the Majority's conclusion that the Court of Chancery erred by allowing the Stockholders to prove that their purpose was proper relying exclusively on the hearsay statements in the Original Demand. I write separately nevertheless because I harbor serious misgivings about the Majority's statement, grounded in our *Thomas & Betts* opinion, that "hearsay is admissible in a Section 220 proceeding when that hearsay is sufficiently reliable."

In the first place, this rule statement seems to run counter to—if not, around in circles with—the underlying purpose of the rule against hearsay, which is the exclusion of inherently unreliable evidence.[1] It seems questionable to me that the rule against hearsay, premised as it is on hearsay's perceived unreliability, should give way—absent a rule-based hearsay exception—to *ad hoc* reliability determinations.

I also believe that *Thomas & Betts*'s hearsay analysis rests on a shaky foundation.[2] A crucial aspect of that analysis was that the challenged testimony was

---

[1] Admittedly, and as one learned treatise puts it, "the unreliability of hearsay can be easily overstated." 10 McCormick on Evidence § 245 (8th ed. Jan. 2020). But it remains the case that out-of-court statements offered to prove the truth of the matter asserted are not subject to cross-examination—"the greatest legal engine ever invented for the discovery of truth," according to Wigmore—and, for this reason, their reliability is suspect. 5 Wigmore on Evidence § 1367, at 32.

[2] Despite my questions concerning the soundness of *Thomas & Betts*'s hearsay analysis, which I believe are worth asking in this concurring opinion, I cannot take serious issue with the Majority's forbearance from reconsidering that opinion given that neither party has asked us to do so.

52

offered to show that there was a credible basis to suspect waste or mismanagement, i.e., wrongdoing. In my view, the analysis took a wrong turn when it observed that "various Thomas & Betts insiders *sought to prove that waste and mismanagement had occurred* at Leviton by testifying to the substance of statements made by Blumberg during his negotiations with Thomas & Betts."[3] But a Section 220 petitioner who has made an investigative demand is not required "to prove that waste and mismanagement ha[s] occurred." If she could do that, her need to inspect the corporation's books and records would be diminished, if not eliminated.

Similar to when a court evaluates a police officer's probable cause to search, the issue to be decided in a Section 220 proceeding, the purpose of which is to seek books and records in furtherance of an investigation of wrongdoing, is not whether the wrongdoing has in fact occurred but whether sufficient evidence exists to justify the investigation. The fact to be proved is not the suspected wrongdoing but rather the reasonableness of the suspicion. Seen in this light, the out-of-court statements typically offered to satisfy the "credible basis" prong are not offered to prove their truth. Thus, they are not hearsay.

Of course, saying that an out-of-court statement might be admissible to show that there is a credible basis to infer wrongdoing that warrants further investigation does not mean that the court cannot reject it—as the Court of Chancery did in

---

[3] 681 A.2d at 1032.

*Thomas & Betts*—as unreliable. But evidence of the stockholder's purpose—the context with which we are dealing here (unlike in *Thomas & Betts*)—stands on a different footing. The issue to be decided in the "proper purpose" inquiry is frequently whether the stockholder's stated purpose is her actual purpose. As such, the truth of the stockholder's statement of purpose is squarely at issue.

Another distinction between the "credible basis" analysis and the "proper purpose" inquiry is worth noting. A stockholder who is not an officer or employee of the corporation will rarely have first-hand knowledge of wrongdoing. Whatever knowledge the stockholder might have will have been derived, in many cases, from information communicated to him by others (e.g., analyst reports, newspaper accounts, investigative reports from regulatory/law enforcement agencies, whistleblowers). By contrast, the stockholder will *always* have knowledge of her purpose because it is, after all, *her* purpose.

For these reasons, I would hold that hearsay evidence is inadmissible to show a stockholder's purpose for an inspection of books and records under Section 220. Such a rule would not, in my view, limit a stockholder's ability to use out-of-court statements to prove that there is a credible basis for her suspicion of wrongdoing.